**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RYAN BRENNAN, | : | |
|      Plaintiff, | : | CIVIL ACTION |
| | : | |
|      v. | : | No. _____ |
| | : | |
| BREEO, LLC, | : | JURY TRIAL DEMANDED |
|      Defendant. | : | |

**COMPLAINT**

Plaintiff Ryan Brennan ("Plaintiff" or "Mr. Brennan"), by and through undersigned counsel, brings this civil action against Defendant Breeo, LLC ("Defendant" or "Breeo"), and avers as follows:

**I. PRELIMINARY STATEMENT**

1.    This is an action for an award of damages, declaratory and injunctive relief, reinstatement, attorneys' fees, and other relief on behalf of Plaintiff Ryan Brennan, a former employee of Breeo, LLC, who has been harmed by Defendant's unlawful employment practices.

2.    Mr. Brennan was Breeo's Purchasing Manager. On February 7, 2025, Breeo gave him a raise and an updated employment offer for 2025 signed by its Chief Executive Officer. Nine days later, Mr. Brennan suffered a car accident that left him with a severe concussion and post-concussive symptoms. Twelve days after the accident, and five days after Mr. Brennan disclosed his emergency-room diagnosis and his need for rest and time off, Breeo terminated his employment. That same day, Breeo signed a replacement to do Mr. Brennan's core job at a substantially higher salary.

3. Plaintiff alleges that Defendant, through its agents, servants, and employees, discriminated against him on the basis of his actual disabilities, his record of impairment, and/or his perceived disabilities, including a severe concussion and related post-concussive condition; failed to provide reasonable accommodations; failed to engage in the interactive process; and terminated his employment because of his disabilities and because he requested accommodation and medical leave.

4. Plaintiff further alleges that Defendant interfered with, restrained, and denied his rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), and retaliated against him for attempting to exercise those rights.

5. These actions constitute violations of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 et seq. ("ADA"), the FMLA, and the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA").

## II. JURISDICTION AND VENUE

6. The original jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 12117, and 29 U.S.C. § 2617(a)(2), as Plaintiff's claims are substantively based on the ADA and the FMLA.

7. The supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367 to consider Plaintiff's claims arising under the PHRA, which arise from the same facts and form part of the same case or controversy.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides and conducts business in this District and because the unlawful employment practices alleged herein occurred in this District.

9.    All conditions precedent to the institution of this suit have been fulfilled. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), docketed as EEOC Charge No. 530-2025-06007, which was dual-filed with and investigated by the Pennsylvania Human Relations Commission ("PHRC") as PHRC Case No. 202402419.

10.    The PHRC closed its file on February 26, 2026, more than one year after the filing of the charge, and Plaintiff has accordingly exhausted his administrative remedies under the PHRA. 43 P.S. § 962(c).

11.    The EEOC issued a Notice of Right to Sue upon request on or about April 28, 2026, and this action is filed within ninety (90) days of Plaintiff's receipt of that Notice.

12.    No administrative exhaustion is required for Plaintiff's FMLA claims, which are timely filed within the applicable limitations period. 29 U.S.C. § 2617(c).

## III. PARTIES

13.    Plaintiff Ryan Brennan is a male individual residing in Parkesburg, Chester County, Pennsylvania.

14.    Defendant Breeo, LLC is a limited liability company registered to do business in Pennsylvania with a principal place of business located at 5002 Lincoln Highway, Kinzers, Lancaster County, Pennsylvania 17535.

15.    At all times material and relevant hereto, Defendant acted by and through its agents, employees, and/or servants, who acted within the scope of their authority and course of employment and under the direct control of Defendant.

16. At all times material and relevant hereto, Defendant was a "person" and an "employer" within the meaning of the ADA and the PHRA and is accordingly subject to the provisions of each said Act.

17. On information and belief, at all times material and relevant hereto, Defendant was engaged in commerce or in an industry or activity affecting commerce and employed fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year, and employed fifty (50) or more employees within seventy-five (75) miles of the worksite at which Plaintiff was employed, such that Defendant was a covered employer under the FMLA. 29 U.S.C. § 2611(4).

18. At all times material and relevant hereto following the completion of his first twelve (12) months of employment, Plaintiff was an eligible employee under the FMLA, 29 U.S.C. § 2611(2), because he had been employed by Defendant for at least twelve (12) months and had worked at least 1,250 hours of service during the twelve-month period preceding his need for leave.

## IV. STATEMENT OF FACTS

### A. Mr. Brennan's Employment and Performance

19. On or about June 21, 2023, Defendant hired Plaintiff as its full-time Purchasing Manager at a salary of $95,000 per year.

20. As Purchasing Manager, Plaintiff led Breeo's procurement team and was responsible for sourcing and managing raw material levels, including steel, poly-lumber, and packaging, procure-to-pay workflow management, inventory item setup, and reducing material and component costs.

21.   Plaintiff initially reported to the Vice President of Operations, then to Chief Executive Officer Amos Stoltzfus, and then, beginning in or around August 2024, to David Ellis, Vice President of Operations.

22.   Plaintiff's 90-day performance review, on October 11, 2023, reflected that he was performing well while continuing to learn company processes and culture.

23.   Throughout his employment, Plaintiff performed high-level responsibilities, including vendor negotiations, procurement strategy, operational support, supplier development, and other purchasing and sourcing responsibilities, and achieved measurable results in cost savings, vendor negotiations, and supplier development.

24.   Plaintiff's September 24, 2024 "People Analyzer" review, his last review before his termination, rated him at or above the bar on every core value and answered "Yes" to all three "Right Person/Right Seat" questions, including "Capacity to do it."

25.   The written comments accompanying the September 24, 2024 review stated, among other things, "Good progress in the last quarter," and set forward-looking goals for 2025, including becoming a subject matter expert on poly-lumber and packaging and negotiating the 2025 steel contract.

26.   Plaintiff was never placed on a Performance Improvement Plan, never received a written warning, and was never otherwise formally disciplined at any point during his employment.

27.   On February 7, 2025, Defendant and Plaintiff executed an updated 2025 Job Offer, signed by CEO Stoltzfus, raising Plaintiff's salary to $97,850, adding eligibility for a profit-share bonus of up to ten percent (10%) of base pay, and confirming his continued role as Purchasing Manager reporting to the Vice President of Operations.

28. The February 7, 2025 raise and updated employment agreement evidenced Defendant's continued confidence in Plaintiff's performance and role.

### B. Mr. Brennan's Accident, Serious Health Condition, and Disability

29. On Sunday, February 16, 2025, Plaintiff was involved in a car accident when a rear tire blew out while he was driving on the highway.

30. Plaintiff immediately notified his supervisor, Mr. Ellis, by text message that he had been in an accident and would be unable to report to work the following day.

31. Mr. Ellis responded, "Dang. Hope everyone is okay. I will cancel the L10 as Adina is also out. Just take a PTO and get your stuff taken care of care of (sic)."

32. Plaintiff did not work on February 17, 2025. On February 18, 2025, Plaintiff communicated with Mr. Ellis regarding an insurance-related appointment and reported to work thereafter.

33. On the morning of February 19, 2025, Plaintiff informed Mr. Ellis that he was experiencing serious symptoms and requested to work from home, writing: "I need to work from home if that's ok. I threw up a couple times over night and have had an excruciating headache. I tried to make it into work and threw up at the gas pump."

34. Mr. Ellis responded in writing: "Ryan. You might have concussion. You should see a doctor. This could be serious. Top of mind today is Packaging vendors."

35. Mr. Ellis thus acknowledged, in writing, the potential seriousness of Plaintiff's condition and in the same breath redirected Plaintiff to vendor tasks.

36. Plaintiff continued working remotely and continued to perform his job duties despite his symptoms, scheduling vendor meetings with McClean, PCA, Carlisle, Hood, and Grafika that same day.

37. On the evening of Sunday, February 23, 2025, Plaintiff informed Mr. Ellis in writing that he had been treated in the emergency room and diagnosed with a severe concussion: "Landed in the ER last night. Ran a bunch of tests. Diagnosed with a severe concussion. I'm going to need to take the day tomorrow. I don't mind remoting in for the L10."

38. Mr. Ellis responded in writing: "Somehow I'm not surprised. What does the doctor recommend? You should probably take it easy for a spell. Don't mess with the head."

39. Plaintiff then relayed his medical restrictions in writing: "The doctor recommended staying away from bright lights, noises, and resting. If the symptoms linger or don't start to improve throughout this week then I should follow up with my primary care physician for further neurological testing," and "Doc said if I have to work to try and take frequent breaks and wear blue light glasses when working in front of a screen."

40. At that point, Defendant had actual notice that Plaintiff had suffered a serious medical condition, that he had been diagnosed in an emergency room with a severe concussion, that he had functional limitations affecting his ability to perform work without accommodation, and that he needed rest and time off.

41. Plaintiff's concussion and resulting post-concussive condition substantially limited one or more major life activities, including thinking, concentrating, sleeping, seeing and tolerating light and noise, communicating, and working, and impaired major bodily functions, including neurological and brain function.

42. In the days that followed, Plaintiff attempted to balance his medical limitations with his job responsibilities, working remotely to the extent he was able, taking medication to force sleep between work sessions, approving purchase orders, fielding vendor issues, and communicating with Mr. Ellis regarding ongoing tasks and scheduling.

43. Plaintiff's condition and limitations were known to and openly acknowledged by his supervisor in contemporaneous written communications.

44. Despite this knowledge, Defendant did not contact Plaintiff regarding accommodations, did not involve Human Resources, did not request medical documentation, did not initiate any interactive process, did not provide Plaintiff with FMLA paperwork or notices, and did not advise Plaintiff of his rights under the FMLA.

**C. Defendant's Own Words Show No Replacement Decision Existed Before the Accident— and an Urgent One Immediately After**

45. Defendant has asserted, in its position statement to the PHRC and EEOC, that it "began seeking a replacement" for Plaintiff on February 10, 2025, six days before Plaintiff's accident, due to ongoing performance struggles.

46. Defendant's own contemporaneous communications refute that assertion.

47. On information and belief, beginning on or about February 10, 2025, Mr. Ellis exchanged text messages with Tate Esterly, a former colleague of Mr. Ellis then employed at another company ("Woodstream" or "WS").

48. On February 10, 2025, at 7:31 a.m., Mr. Ellis wrote to Mr. Esterly: "Good morning Tate I just returned from a three week trip to Asia getting settled back in and was wondering how your job outlook is and whether or not you're still open to discussion about something in the future I'd like to make sure we keep in touch."

49. That message was an exploratory networking outreach about "something in the future" - not the commencement of a search to replace Plaintiff, and it identified no open position, no role, and no timetable.

50. On February 12 and 13, 2025, Mr. Ellis asked Mr. Esterly about his wage and benefits package "to make sure we can afford you," and Mr. Esterly responded with his compensation expectations, including that he expected to be "at 6 figures" at his next review.

51. On or about February 13–14, 2025—two days before Plaintiff's accident—Mr. Ellis wrote to Mr. Esterly: "I'd probably have to work with you on a total package to be able to complete. But I am looking into it right now.  I'm 95% sure something will open up in the next 2 months."

52. By Defendant's own words, as of February 13–14, 2025, there was no open position for Mr. Esterly; there was, at most, a possibility that "something" would "open up" at some point "in the next 2 months."

53. Mr. Ellis's February 13–14, 2025 message did not identify Plaintiff, Plaintiff's position, or any particular role. It was not until February 18, 2025, two days after Plaintiff's accident referenced below, that Mr. Ellis first identified a contemplated opening as one to "replace an existing Purchasing Manager."  Accordingly, even if the "something" Mr. Ellis referenced encompassed Plaintiff's position, by Defendant's own words no decision to terminate Plaintiff had been made as of February 13–14, 2025.

54. On Sunday, February 16, 2025, Plaintiff had his accident and notified Mr. Ellis.

55. The next business day, Monday, February 17, 2025, while Plaintiff was out of work because of the accident, Mr. Ellis's posture toward Mr. Esterly abruptly changed from exploratory to urgent.  At 11:34 a.m., Mr. Ellis wrote: "How's your schedule for a potential interview with me and our CEO. I'm trying to get some time on his calendar for an informal meeting. Is Friday open at all?" At 3:05 p.m., he added: "I'd like to get you in this week if at all possible."

56. On February 18, 2025, the day before Plaintiff reported vomiting and an excruciating headache, Mr. Ellis instructed Mr. Esterly to bring a resume, scheduled an interview at Breeo's

facility, and wrote: "I'm trying to keep this fairly low profile because you may be replacing an incumbent. Just stay in your car until I get you."

57. When Mr. Esterly asked, "OK. And what job is that?", Mr. Ellis responded: "Global Sourcing Manager to replace an existing Purchasing Manager."

58. Even then, two days after Plaintiff's accident, Mr. Ellis described the replacement of Plaintiff as conditional: Mr. Esterly "may" be replacing an incumbent.

59. Mr. Ellis's instruction to keep the interview "fairly low profile" and to have Mr. Esterly wait in his car reflects Defendant's consciousness that it was moving to replace an employee who remained employed, uninformed, and medically impaired.

60. On February 18, 2025, Mr. Ellis also asked Mr. Esterly to supply a contact for Grafika, one of the very packaging vendors within Plaintiff's portfolio that Plaintiff was actively scheduling meetings with on February 19, 2025.

61. After Mr. Esterly rescheduled, the interview was confirmed for Monday, February 24, 2025 - the day after Plaintiff disclosed his emergency-room diagnosis of a severe concussion and his need for time off.

62. On February 24, 2025, Mr. Esterly interviewed at Breeo with Mr. Ellis and CEO Stoltzfus. Defendant has admitted that this interview for Plaintiff's replacement occurred on February 24, 2025.

63. On February 28, 2025, Defendant terminated Plaintiff's employment. That same day, Mr. Esterly signed Breeo's written offer of employment for the position of "Strategic Sourcing Manager," reporting to the Vice President of Operations, at a salary of $120,000 per year, approximately twenty-two percent (22%) more than Plaintiff's salary, with a hire date of March 17, 2025.

64.    The "Strategic Sourcing Manager" role assumed by Mr. Esterly encompasses the same core duties Plaintiff performed as Purchasing Manager, including managing raw material inventory and supply chains for steel, poly-lumber, and packaging; negotiating payment terms and costs; and coordinating with procurement.

65.    The sequence of Defendant's own communications, which began as exploratory networking on February 10; "95% sure something will open up in the next 2 months" on February 13–14, to an urgent "this week if at all possible" interview request on February 17, the first business day after Plaintiff's accident, to "you may be replacing an incumbent" on February 18; an interview on February 24, the day after Plaintiff's severe-concussion disclosure; and a signed replacement offer on February 28, the day of Plaintiff's termination, supports the inference that Defendant's decision to terminate Plaintiff was made, and accelerated to completion, after and because of Plaintiff's accident, disability, and requests for accommodation and leave.

### D. The Termination

66.    On the evening of February 27, 2025, Mr. Ellis texted Plaintiff: "Can you make it in tomorrow for at least part of the day? We've got stay on top of the Ace package project. Artwork releases starting as early as tomorrow."

67.    On February 28, 2025, when Plaintiff reported to work, Defendant terminated his employment at a meeting conducted by Mr. Ellis with Human Resources representative Tammy Bitting present.

68.    The stated reason for Plaintiff's termination was performance—despite Plaintiff's raise and updated employment agreement three weeks earlier, his most recent review answering "Yes" to all "Right Person/Right Seat" criteria, his improving performance history, and the

absence of any Performance Improvement Plan, written warning, or other formal disciplinary action.

69.    Plaintiff was caught off guard by the termination and had not been warned that his job was in jeopardy.  He disputed the characterization of his performance at the meeting and noted that he had raised concerns about workload, lack of support, and unclear expectations.

70.    Defendant's own notes of the termination meeting acknowledge that Plaintiff stated he had not been informed of the alleged shortcomings as they arose, that Mr. Ellis apologized for at least one of his stated criticisms (regarding packaging vendor diversification) during the meeting itself, and that Mr. Ellis apologized for "the timing of the termination, citing personal health issues stemming from an accident."

71.    The contemporaneous documentation shows that Plaintiff's accident and medical condition were actively on Defendant's mind at the time of the termination.  This includes Mr. Ellis's February 19, 2025 text acknowledging that Plaintiff "might have concussion" and that "[t]his could be serious"; Mr. Ellis's February 23, 2025 text advising Plaintiff to "take it easy for a spell" and "[d]on't mess with the head"; and Defendant's own written report of the February 28, 2025 termination meeting, recording that Mr. Ellis "apologized for the timing of the termination, citing personal health issues stemming from an accident."

72.    Within five days of Plaintiff's disclosure of his severe concussion and need for time off, Defendant terminated his employment, and it hired his replacement the same day.

73.    At no point did Defendant consider or offer any alternative to termination (e.g., a short period of leave, a temporary adjustment of duties, continued remote work, or even a referral to Human Resources regarding his condition) despite the temporary, treatable nature of Plaintiff's injury and the modest accommodations his doctor had recommended.

74. The close temporal proximity between Plaintiff's disclosures and his termination - termination twelve days after the accident, nine days after Plaintiff's first symptom-related accommodation request, and five days after disclosure of his severe-concussion diagnosis and need for time off - supports an inference that Defendant's actions were motivated by Plaintiff's disability, perceived disability, record of impairment, need for accommodation, and/or need for protected medical leave.

75. Defendant's stated reason for the termination was pretextual. Plaintiff was terminated on the basis of his disability, his record of impairment, and/or Defendant's perception of his disability, and in retaliation for seeking accommodation and medical leave.

76. At all relevant times, Plaintiff was qualified for his position and was able to perform its essential functions with or without reasonable accommodation—as demonstrated by the work he continued to perform throughout his recovery.

77. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages, including lost wages and benefits, emotional distress, embarrassment, humiliation, and loss of enjoyment of life.

## COUNT I
### Disability Discrimination and Failure to Accommodate – ADA
### (42 U.S.C. § 12101 et seq.)

78. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

79. At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the ADA.

80. Plaintiff's severe concussion and resulting post-concussive condition constitute a disability within the meaning of the ADA. The condition substantially limited one or more major

life activities, including thinking, concentrating, sleeping, seeing and tolerating light and noise, communicating, and working, and impaired major bodily functions, including neurological and brain function. 42 U.S.C. § 12102.

81.   Plaintiff also had a record of such impairment and/or was regarded by Defendant as having a physical or mental impairment. 42 U.S.C. § 12102(1)(B)–(C).

82.   Defendant was aware of Plaintiff's disability and resulting limitations, including through Plaintiff's direct written communications describing his diagnosis, symptoms, and medical restrictions, and through Mr. Ellis's own written acknowledgments of the condition and its seriousness.

83.   Plaintiff requested reasonable accommodations, including working from home, short periods of leave and rest, frequent breaks, and reduced screen and sensory exposure, consistent with his doctor's recommendations.

84.   The accommodations Plaintiff needed were reasonable, temporary in nature, and would have allowed him to perform the essential functions of his position—as demonstrated by the work he in fact continued to perform.

85.   Despite this knowledge, Defendant failed to engage in any interactive process, failed to seek medical clarification, and failed to provide or even discuss reasonable accommodation.

86.   Defendant instead terminated Plaintiff's employment because of his disability, his record of impairment, and/or his perceived disability, and replaced him with an individual hired the same day he was terminated.

87.   Defendant's conduct was intentional, willful, and undertaken with malice or reckless indifference to Plaintiff's federally protected rights.

88. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages, including lost wages and benefits, emotional distress, embarrassment, humiliation, and loss of enjoyment of life.

## COUNT II
### Retaliation – ADA
### (42 U.S.C. § 12203)

89. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

90. Plaintiff engaged in protected activity under the ADA by informing Defendant of his disability, communicating his medical restrictions, and requesting accommodation, including remote work, rest, breaks, and time off.

91. Defendant knew of Plaintiff's protected activity.

92. Shortly thereafter—within days—Defendant took materially adverse action against Plaintiff by terminating his employment.

93. The timing and circumstances of Defendant's actions, including the acceleration of replacement discussions immediately following each of Plaintiff's disclosures and the absence of any pre-accident termination decision, give rise to an inference of retaliatory intent.

94. Defendant's stated rationale for the termination was pretextual.

95. Defendant's actions were taken because of Plaintiff's protected activity, in violation of the ADA.

96. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages, including lost wages and benefits, emotional distress, embarrassment, humiliation, and loss of enjoyment of life.

**COUNT III**
**Interference – FMLA**
**(29 U.S.C. § 2615(a)(1))**

97.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

98.    At all relevant times, Defendant was a covered employer under the FMLA and Plaintiff was an eligible employee.

99.    Plaintiff suffered from a serious health condition within the meaning of the FMLA, including a severe concussion and related post-concussive symptoms involving emergency-room treatment, continuing symptoms, and medically recommended rest and follow-up care, which rendered him unable to perform one or more essential functions of his position and/or required medical leave. 29 U.S.C. § 2611(11).

100.    Plaintiff provided Defendant with adequate and timely notice of his serious health condition and need for leave, including informing his supervisor in writing of his emergency-room treatment, his diagnosis, his symptoms, his medical restrictions, and his need for time off and rest.

101.    Defendant was therefore on notice that Plaintiff might be entitled to leave under the FMLA, which triggered Defendant's obligations to notify Plaintiff of his eligibility and rights, to request certification if desired, and to designate qualifying leave as FMLA-protected. 29 C.F.R. §§ 825.300–825.301, 825.303.

102.    Despite this notice, Defendant failed to advise Plaintiff of his rights under the FMLA, failed to provide the required eligibility, rights-and-responsibilities, and designation notices, failed to designate his absences and reduced schedule as FMLA-qualifying leave, and failed to provide him with the protections afforded by the FMLA.

103.  Instead, Defendant terminated Plaintiff's employment five days after he disclosed his diagnosis and need for time off, thereby denying him the leave to which he was entitled and cutting off his FMLA rights entirely.

104.  Defendant thereby interfered with, restrained, and denied Plaintiff's exercise of and attempt to exercise his rights under the FMLA, and Plaintiff was prejudiced thereby.

105.  Defendant's conduct was willful, and Defendant did not act in good faith or with reasonable grounds to believe that its conduct complied with the FMLA.

106.  As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages, including lost wages, salary, employment benefits, and other compensation, and he is entitled to liquidated damages, equitable relief, interest, and attorneys' fees and costs pursuant to 29 U.S.C. § 2617.

**COUNT IV**
**Retaliation – FMLA**
**(29 U.S.C. § 2615(a)(1)–(2); 29 C.F.R. § 825.220(c))**

107.  Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

108.  Plaintiff engaged in protected activity by providing notice of his serious health condition and invoking his need for medical leave and rest.

109.  Five days after Plaintiff disclosed his severe-concussion diagnosis and need for time off—and twelve days after his accident—Defendant terminated his employment.

110.  The close temporal proximity between Plaintiff's invocation of his rights and his termination, together with Defendant's contemporaneous acceleration of its recruitment of Plaintiff's replacement following each of Plaintiff's medical disclosures, its failure to provide any

FMLA notices, and the absence of any documented pre-accident termination decision, establishes a causal connection between Plaintiff's protected activity and his termination.

111.  Defendant's stated rationale for the termination was pretextual.

112.  Defendant terminated Plaintiff and otherwise discriminated against him because he exercised and attempted to exercise his rights under the FMLA.

113.  Defendant's conduct was willful, and Defendant did not act in good faith or with reasonable grounds to believe that its conduct complied with the FMLA.

114.  As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages, including lost wages, salary, employment benefits, and other compensation, and he is entitled to liquidated damages, equitable relief, interest, and attorneys' fees and costs pursuant to 29 U.S.C. § 2617.

**COUNT V**
**Disability Discrimination, Failure to Accommodate, and Retaliation – PHRA**
**(43 P.S. § 951 et seq.)**

115.  Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

116.  At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the PHRA, had a record of such impairment, and/or was regarded by Defendant as having an impairment.

117.  Defendant was aware of Plaintiff's disability and resulting limitations through his direct written communications and his supervisor's written acknowledgments.

118.  Plaintiff requested reasonable accommodations under the PHRA, including remote work, rest, breaks, reduced sensory exposure, and time off.

119. Defendant failed to engage in a good-faith interactive process and failed to provide reasonable accommodations.

120. Defendant discriminated against Plaintiff by terminating his employment because of his disability, record of impairment, and/or perceived disability.

121. Plaintiff engaged in protected activity under the PHRA by disclosing his condition and requesting accommodation and medical leave, and Defendant retaliated against him by terminating his employment because of that protected activity.

122. Defendant's conduct violated the PHRA.

123. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages, including lost wages and benefits, emotional distress, embarrassment, humiliation, and loss of enjoyment of life.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ryan Brennan respectfully requests that this Court enter judgment in his favor and against Defendant Breeo, LLC, and order that:

a. Defendant reinstate Plaintiff to his former employment position, or award front pay in lieu of reinstatement;

b. Defendant compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which he would have been entitled had he not been subjected to unlawful discrimination and retaliation (all Counts as allowable);

c. Defendant compensate Plaintiff with an award of back pay (all Counts as allowable);

d. Defendant compensate Plaintiff with an award of front pay, if appropriate (all Counts as allowable);

e. Defendant pay Plaintiff compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, as allowable under the ADA and PHRA;

f. Defendant pay Plaintiff punitive damages as allowable under the ADA;

g. Defendant pay Plaintiff liquidated damages as allowable under the FMLA, 29 U.S.C. § 2617(a)(1)(A)(iii);

h. Defendant pay Plaintiff pre-judgment and post-judgment interest, costs of suit, and attorneys' fees as allowed by law, including under 42 U.S.C. § 12205, 29 U.S.C. § 2617(a)(3), and 43 P.S. § 962(c.2); and

i. The Court award such other relief as is deemed just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: July 17, 2026

<div style="margin-left:50%">

Respectfully submitted,

HENNESSY LAW, P.C.

By: /s/ Brendan Hennessy
Brendan Hennessy, Esquire
PA Attorney I.D. No. 91831
Kay Hennessy Seven, Esquire
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
(484) 875-3111
bren@hennessylawfirm.com
*Counsel for Plaintiff Ryan Brennan*

</div>